Good morning. Case number 12-1593, Jane Doe v. The University of Chicago Hospitals. Once again, my name is Tom Dimitrio. Good morning. Good morning. Happy Law Day to everybody here. And thank you for the opportunity to address you today and any concerns that you might have. The case of Dillon involved the same law firms that appear before you today. And that case taught us that jury instructions must state the law fairly, correctly, distinctly, and must not mislead the jury or prejudice a party. Defendant's instruction number 14 in this case resulted in great prejudice. It tendered, the defendant did, in defendant 14, a gutted, not just modified, a gutted version of IPI 5001. IPI 5001 is entitled, both the principal and the agent sued. No issue as to agency. That wasn't the case before this trial court. The agent was not sued. The agent had been sued, but was dismissed from the lawsuit before the start of trial. That was my decision because I didn't want a verdict against the agent. I didn't want a libel finding against the agent. The first sentence of 5001 states, the defendants are sued as principal and agent. That was taken out. That's the so-called modification. I call it the gutting. Because the word liable in that instruction makes sense when both the principal and the agent are sued. Because there's going to be a finding on the verdict forms against both the agent and the principal. Or not. But the fact is, the only way to find liability against a party is to enter a verdict form. That couldn't be done here. There is no support in IPI or the case law for the giving of 5001 where the agent has not been sued. So was the law adamant? Let me ask you this. In the hypothetical event that we possibly agree with you that the giving of the instruction, number 14, that the plaintiff might have been prejudiced by the giving of that instruction. My question to you is, how would that have changed the verdict? How would the verdict have been different? Well, the verdict would have been different because the jury having no direction how to find Dr. T liable. The instruction now states, if you find Dr. T liable, the principal's liable. If you find he's not liable, the principal's not liable. So there was no direction in the instructions to help them find him liable. I was prevented, prohibited, from arguing to this jury that Dr. T was liable. Because it has no definition. If this court were to look at 23.01 of the IPI instructions. But how does the plaintiff establish that absent the error, there would have been a different verdict? Because we don't know. That's the problem. We don't know what this jury was thinking. How do we find him liable? There's no way to find him liable. Therefore, the University of Chicago is not liable. 23.01 used to be entitled up until 2003, admitted liability. The committee changed that. They got rid of the words admitted liability because it means liability, different things to different people. That's stated in the comments to the instructions that now control 23 series. Liability is a legal word. It's a term that this jury had no idea what it meant. And I was supplied a burden of proof at the last minute, right before final argument, to now I have to prove, this instruction was given according to the trial court because, quote, that's the accurate statement of the law. I then now got a burden of establishing not that Dr. T was just negligent, but that he was liable. What does that mean? So the trial court says it's an accurate statement of the law. On post-trial motion, in his written order denying the post-trial motion, he acknowledged it was not an accurate statement of the law for the facts of this case. That's in writing, acknowledging he was wrong. But he didn't take it to the next step, which I'm asking this court to do. And that is to grant a new trial based upon this jury being supplied a wrong statement of the law that applied in this case. So, by the way... The question is that this court reviews the trial court's decision and not its reasoning. And in light of that decision, again... It was unreasonable, I submit, for this trial court to supply to this jury an instruction that was not based upon the facts of this case and was a wrong statement of the law to apply to this case. Because liability, as it turns out... The defendant, in post-trial motion, supplied the court with a definition from Webster's. And it means financial responsibility. That's what liability means. This is what I wanted to avoid. The supplying of potential. They could be looking at Dr. T, who was sitting there in final argument. The defendant thanked the jury on his behalf. This non-party. And for all we know, they're thinking liability. If we find against the University of Chicago, is he going to have to pay this? Is he going to lose his job? We don't know what they were thinking. But the fact is they shouldn't have been put in that position. I shouldn't have been put in that position to have to argue that he's liable. I couldn't do it. And they shouldn't have been in a position of trying to figure out what it means. So IPI has given this court authority to appreciate that liability is a difficult word to understand. Anyway, I believe that this is a misstatement of the law at a high level. Counsel, can I interrupt you for just one second? I know the judge said something like all the instructions together send you a path to get it. Right. Can you tell us why there is no path? There's no path because a roadblock was put up blocking that path. The roadblock being you have to first find the defendant, I mean the non-party agent liable. And the instructions, the jury's told you can't pick out some instructions and disregard others. So this instruction could not be put on a shelf and sort of forgotten about. And this unknown path that he doesn't describe needs to where? I'm suggesting it never got to be traveled. So I don't know what he was thinking, but I do know this. That there was no way that this jury could find the non-party agent liable. Because there was no verdict for him for that to happen. Counsel, there's a case named Lambie 305 Illap III that says that in addition to prejudice, a party must show that a reasonable basis supports a conclusion that but for the error, the verdict might have been different. That's a Fourth District case. I keep asking you. Yeah, I cite it in our brief and I embrace it. And the fact of the matter is this jury was given the impossible task of first determining that Dr. T was liable. Not negligent. Liable. And that can't happen. It can't happen under the facts of this case because there was no way to find him liable. And I really am emphasizing this 2300 series where the committee in 2003 said liability means too many things to too many different people. And the definition of liability means financially responsible to pay. You can be negligent, but not financially responsible to pay. So I embrace that Fourth District case, Justice. Counsel, I have a question regarding Lambie. Factually, is it indistinguishable from the facts in this case? Because there the issue was with regards to the expert's testimony, whether or not they had an opportunity to examine the plaintiff in Lambie. Whereas as here, from the record, it appears that everybody had an opportunity to examine either or knew about the case in regards to the plaintiff's condition. I think so. I mean, yeah, I'll answer that directly, yes. Okay. Yeah. But I don't think it's relevant, that fact is relevant to your decision. I am very bad at keeping track of my time, so I don't. You have two minutes. How many? Two. I've got two? Okay. Informed consent. If I can move on? Go ahead. Informed consent. This is simple. Okay. She wasn't given anything. None. Zero. Sipo. Nada. And I, in my answers to 213 interrogatories, disclosed the agent, Dr. T, as my liability, as a liability expert for me. In addition to Dr. Pollack. And at trial, Dr. T testified that he thought it was very important that a patient know that there's a CDC high-risk kidney involved, and to get a discussion going, talking about the risks and the advantages to having the surgery. None of that happened here. Nobody had such a conversation. And what about the various other experts who say that the standard of care was not reached? Okay. So here we go. Dr. Pollack, my expert, stated point blank, Dr. T did not meet the standard of care. The defendant's expert. Here it is. Question. This is page 1727 of the transcript. My question to him. Assume that the transplant surgeon involved in this case believed it was important to get informed consent from a patient like Amy with respect to a CDC high-risk nature of a donor kidney. Assume that. That would meet the standard of care, right? Yes, was his answer. Their expert testified that the agent's way of doing things met the standard of care. But without contradiction at this trial, Dr. T testified that what should have been done was not done. There was no informed consent regarding this high-risk kidney given to this patient. Or, as importantly. And what about the fact that the plaintiff herself testified that if she had known that her chances of dying while on dialysis were greater than the risk of contracting HIV, she would have accepted the kidney. In addition to the expert saying that the standard of care had not been reached. If she were to be dying. She wasn't dying. The uncontested evidence was she was doing great. But if she knew that her chances of dying, not that she was dying, looking at the stats and the comparisons of being on dialysis versus receiving a kidney, albeit a kidney that was HIV infected from a high-risk donor. That if she had known that comparing those things, that her risk of survival was far greater, then she would have accepted the defective kidney. But none of that was accurate. None of that was accurate. As a matter of fact. You're saying that the information, that the statistics that were given were inaccurate in terms of dialysis versus an infected HIV kidney? Here's what I'm saying. Yes, sir. Both. You're over your time, but I asked the question. Answer my question, go on. Thank you. Both defendant's expert and Dr. T stated that since Amy was 38th on the waiting list and would have been given more kidney offers soon, that she would have been better off not accepting this kidney. This risk of dying, which by the way, would have been talked about in an informed consent discussion, according to Dr. T, if it had occurred, but it didn't, is all speculative. But the facts are that in this case, informed consent, plaintiff's instruction number 17, given without objection, the definition of informed consent, none was given in this case. So are you saying that the evidence is inaccurate in questioning the plaintiff, that the plaintiff's risk of dying in the next year while on dialysis was 1 in 5 as opposed to 1 in 1,000 if she accepted the kidney? I'm saying that that was not established in this case. That's what I'm saying. All right, counsel, your time is up. You'll have two minutes in rebuttal. Thank you. Two or three, Judge. I'm sorry, three minutes. Thank you. Thank you. May it please the court. Counsel. My name is Garrett Boehm. I'm here on behalf of the University of Chicago Medical Center. Many pages of this appellate briefing today has been spent on the issue of a single jury instruction. There have been many pages of the appellate briefing today spent on a single jury instruction. But what this case is really about is the question of what informed consent was and whether or not the standard of care was met by the University of Chicago Medical Center and its transplant surgeon, Dr. Thistlethwaite, as to the giving of that informed consent. Specifically, was the plaintiff entitled to know whether or not her donor was a homosexual? The answer to that question is no. But there was testimony at trial that she was given the information that her donor was a homosexual and engaged in a high-risk lifestyle. There was testimony that she would have been given. There was testimony that it was the practice of Nurse Farman, I'm sorry, who had previously been at Gift of Hope, who had been doing this job for many, many years, that it was her practice always to tell the recipient if there was a high-risk lifestyle involved. That testimony was given. The jury heard that. There was a plaintiff who said that she didn't receive that information. So the jury had a fact question. Had it determined whether or not the plaintiff knew that the donor was engaged in a high-risk lifestyle? When we're presented with a general verdict like we are here, I would suggest to you that the manifest way of the evidence has been met and the plaintiff loses that argument. But let's assume that she wasn't given that information. What was the standard of care? The standard of care was established through expert testimony, and there was a battle at trial between Dr. Pollack and Dr. Sega. Dr. Pollack faced his- Can I interrupt you? Absolutely, Your Honor. I don't mean to interrupt you, but because you have so little time, I just want to clear this for myself. So you're saying the issue is not whether the doctor gave her informed consent regarding the risk, et cetera, of this surgery, but the issue is whether or not she was informed that the donor was a high-risk? I would say that's how this case was tried. There is a question, according to Dr. Pollack, no less, as to whether or not the giving of this information was even informed consent. On page C1280 and 1281 of the record, the question was asked, but telling a patient that a donor is CDC high-risk is not giving the patient an informed consent, is it? Answer, no. Question, it's just telling the patient something about a lifestyle of the decedent, correct? Answer, correct. But that's how the case was tried on this question of whether or not- That's what I wanted to ask. I haven't read the whole record. I am going to. But it seems like, from what I read, that the plaintiff's case was that is a part of informed consent, that you tell the person about the lifestyle of the donor, and then the surgeon determines or tells them the informed consent, the risk of doing it this way or another way. How informed consent worked. I'm trying to answer your question. How informed consent worked at the University of Chicago Medical Center, and it works at transplant centers throughout the United States, is that there is a team approach to informed consent. It starts before the patient is even enrolled in the program. She gets a packet of information and orientation, a pretty thick packet. That packet starts the discussion about what the risks are and what the alternatives are to transplant surgery. Within that team approach- I hate- Absolutely. Yeah, because I have another issue I want you to get to. I'm just asking, aren't they both part of informed consent? The fact that it's a high-risk person and the possible risk to the patient by accepting this. I think Dr. Pollack answered that question that it's no, it's not part of informed consent. Because what informed consent is, is the giving of information associated with the risks and alternatives. Information about the donor was information, but it wasn't a discussion about the risks. The discussion about the risks and alternatives started in the year 2000, August of 2000, when the plaintiff decided that she wanted to enroll in the transplant program. So she received that information, that packet of information. Plaintiff's Exhibit 517. Then she had one-on-one discussions with transplant surgeons, with nurses, with social workers, with psychiatrists. And there is evidence in the record as to that informed consent given by the plaintiff. I would point you to C1490-92 by Nurse Harmon, C916 and 917. Dr. Thistlethwaite, C806, 807, 810, 814, and pages in between. And also by Nurse Davis at pages C855 and C863. What about this particular kidney? I mean, what was the information that was provided in terms of informed consent? When this particular kidney became available, the information about it was shared by Gift of Hope and was given to the transplant center and Dr. Thistlethwaite. He discussed it with Nurse Harmon. He then asked Nurse Harmon to communicate the information about that organ to the plaintiff. And was that done? That was done through telephone communication. It started at 515. But according to the record, it's not clear whether it was done or not. She says that was her normal operating procedure in practice. Correct. What did the nurse's notes indicate? I don't believe there were any nurse's notes on it. What we had at trial in the form of evidence was that these calls took place and Nurse Harmon's testimony about what her practice was throughout her career and in this instance. And then on the other hand, you had the plaintiff's testimony about the information that was relayed to her. I believe her testimony was that she didn't recall the conversation between herself and Nurse Harmon, correct? Could you say that again? I'm sorry. The plaintiff testified she didn't recall if there was a conversation between Nurse Harmon and her on this particular issue. That's true. The plaintiff did say that. On the other hand, Nurse Harmon said that it was her pattern in practice to always relay this information, the information that Dr. Thistlethwaite had discussed with her about this specific organ. And on this particular issue, the only information or evidence that we have is Nurse Harmon's testimony, correct? Correct. Okay. So as to what the standard of care, I'm going to transition back to the standard of care and what it required. Dr. Pollack said he relied on the 1996 CDC guideline. The problem with that is that it was a guideline. That wasn't the standard of care. The standard of care was established by OPTN and UNOS. They were the bodies that were assigned with establishing national policies on this issue. According to the policy, the standard of care in effect as of January 2007, it was not required to tell a transplant recipient that the organ donor was engaged in a high-risk lifestyle. So then whether or not Nurse Harmon communicated the fact that this was a high-risk donor would not be indicative of a breach of the standard of care. Is that your argument? That's true. And that's the evidence the jury heard. And the jury was very clear in its determination when it answered special interrogatories. It said, asking whether or not Dr. Thistlethwaite was the proximate cause of plaintiff's injuries, no, 12 jurors. Answering the question, was Dr. Thistlethwaite negligent, 12 jurors, no, he was not. Another question regarding the guidelines? Yes. All right. What's the purpose of the guidelines? The CDC guidelines? Yes. It was just a CDC document created in 1996 that were suggestions and guidelines issued by the CDC. And the transplant community considered those and did not adopt them. So they could choose to follow them or not follow them? They could choose to follow them or not follow them, true. And how did they make that determination as to when they're going to follow the guidelines and whether or not the guidelines provide for that? No, the guidelines do not. It is strictly up to OPTN and UNOS as to what the standard of care is. And as of the date of this transplant, they had not adopted those CDC guidelines. After this incident occurred, those guidelines changed. And then it became necessary, according to the standard of care after this transplant, to communicate that information. But that only happened because as of January 2007, out of 425,000 transplants that occurred since 1986, there had never been an instance of HIV being communicated because of infection during the window period. I'm going to jump in. Yes. I would like to go back to the issue of the jury instruction. Yes, absolutely. Right. I know. We only have so little time. If, hypothetically, we think your jury instruction was wrong, how do the other jury instructions give the jurors the clear path to make a decision? Thank you for asking that question, Justice Lankin. I look at the instructions that were issued, specifically starting on page C-2275 and continuing thereon. There are 13 separate references to a reasonable transplant surgeon. A reasonable transplant surgeon. So the jury knew that its focus was upon the conduct of Dr. Thistlethwaite and everything that he was responsible for. And he testified at trial. Informed consent is my job. It's my responsibility. If there was a failure, it falls on me. It doesn't fall on Nurse Harmon. And it doesn't fall on anybody else. The buck stops here, is basically what he said. So the jury knew that. They knew that through the issues instruction. They knew that through the burden of proof instruction. And they knew that through the informed consent instruction. In providing medical treatment to Amy Mason, a transplant surgeon must obtain Amy Mason's informed consent. When I use the expression informed consent, I mean a consent obtained from a patient by a transplant surgeon. After the disclosure of the transplant surgeon, of those risks of and alternatives to the proposed treatment, which a reasonably careful transplant surgeon should disclose, under the same or similar circumstances. The jury knew what this case was about. And they determined that either Amy Mason had received the information about the high-risk donor, or they then looked at the, assuming that she had not, they looked at the standard of care. And the standard of care did not require that that information was communicated to her. And that's why they answered the special interrogatories the way they did. That's why they said Dr. Thistlethwaite is not the proximate cause. And he's not negligent. And if he's not the proximate cause, and he wasn't negligent, there was no way to hold the hospital negligent or liable. The plaintiff has focused a lot on the use of the word liable in IPI 50.01. If it was as simple as the plaintiff says it was, if there was absolutely no way for the hospital to be held liable, because there was no way to hold Dr. Thistlethwaite liable, because he wasn't a party, it would have been a very easy process for the jury to determine what the correct verdict was here. It had to be no. But what did they do? They asked questions. They wanted to know what informed consent was all about. They asked for this document during deliberations. They wanted to know what informed consent was given and what it included. And after they asked, they assessed that information. They went to the special interrogatories. They went to the verdict. And they said, no, the hospital is not liable. I would suggest to your honors that the giving of 50.01 was not so seriously prejudicial that the plaintiff did not receive a fair trial. This was a trial that was conducted by two very, very good trial attorneys who have extensive years of experience. They made decisions. At trial, for instance, Mr. Dimitrio did not object to the use of the word liable until after that instruction was given. There is reference in the reply that he objected before the instructions had actually been handed to the jury. Well, I would still suggest that the objection is the word liable has been waived because that objection was not made before the instructions were read to the jury. If there are no further questions, I thank you for your time, Your Honor. Thank you, Your Honor. Counsel? Counsel? I'd like to first say the CDC in 1996 stated in its policy that you can use a high-risk donor kidney like this one, but only after you tell the patient of the risks involved. In opening statement, the legal representative for the University of Chicago stated to the jury that Dr. Thistleweight adopted the CDC guideline and used it in his practice. So it was relevant. I'd also like to say this Yellow Pages phone book of the pamphlet that she got in the year 2000 that the jury did in fact ask for doesn't have one thing in it about a CDC high-risk kidney. So this is a case about informed consent, not about informing the patient that this is a high-risk kidney. What about your opponent's argument that the University of Chicago was not required to adopt the CDC guidelines and in fact had not? No. That it's not reflected? It is. In the opening statement, the legal representative said that Dr. Thistleweight and the University of Chicago, it's there, in the defendant's opening statement, adopted the CDC guidelines. So they did adopt them. I have to also say it's a case about informed consent, not just about informing a patient that it's a high-risk kidney. Also the alternative has to be discussed, as the jury instruction says. And the jury instruction says that you have to talk about the risks and the alternatives. None of that was done by anybody in this case. And I have to, with permission, the final argument, there's something so egregious that was done here that I need to mention it. And that is that this very seasoned lawyer for the University of Chicago, who unserved the job of the jury, and he judged the credibility of his own witness, stated at the end, last thing said to the jury in the final argument, I know you feel bad for Amy Mason. Anybody would. But she's going to continue to get her care at the University of Chicago, and here it is. No matter what you do. No matter what you do. It's okay if you find not guilty here. We're going to take care of her. What about your opponent's argument that you waived the issue of, the liable issue that you're arguing today? That you waived it because you didn't raise it. Yeah, no, what I raised was that he's not a defendant. That was my stated objection. You don't give 50.01 unless you are a defendant. And I stated he's not a defendant. And by that, that encompasses, believe me, everything. Because liable only makes sense in 50.01. Because both are going to be found responsible fiscally on a verdict form. Time is up, counsel. Thank you. Thank you, counsel. This matter will be taken under advisement. This court is adjourned.